UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

NATIONAL INTEGRATED GROUP PENSION
PLAN and BOARD OF TRUSTEES OF THE
NATIONAL INTEGRATED GROUP PENSION
PLAN,

                              **MEMORANDUM & ORDER**

                    Plaintiffs,          11-CV-3652 (MKB)


            v.


DUNHILL FOOD EQUIPMENT CORP., ESQUIRE
MECHANICAL CORP., GEOFFREY THAW,
SANFORD ASSOCIATES and CUSTOM
STAINLESS, INC.,

                    Defendants.

--------------------------------------------------------------x

MARGO K. BRODIE, United States District Judge:

          Plaintiffs National Integrated Group Pension Plan (the "Plan") and the Board or Trustees

of the Plan filed the above-captioned action pursuant to the Employee Retirement Income

Security Act ("ERISA") to collect a sum of withdrawal liability against Defendants Dunhill Food

Equipment ("Dunhill"), Esquire Mechanical ("Esquire"), Geoffrey Thaw, Sanford Associates

("Sanford") and Custom Stainless.  This action was filed on July 28, 2011.  The Complaint

named only Dunhill, Esquire and Does 1 through 10.  Plaintiffs filed an Amended Complaint to

add Thaw, Sanford and Custom Stainless as defendants.  Defendants now move for partial

summary judgment with respect to Plaintiffs' claims against Thaw, Sanford and Custom

Stainless.[1]  Plaintiffs move for summary judgment against all Defendants.  Defendants Sanford

_____

          [1] Defendants' motion was filed as a motion for judgment on the pleadings.  However, at
oral argument, Defendants conceded that they were relying on documents outside the pleadings,

and Thaw also move for protective relief, including a stay of this action, in the event that the Court finds that certain factual issues must be arbitrated. The Court heard argument on December 4, 2012. For the following reasons, Defendants' motion for partial summary judgment is granted in part and denied in part, and Plaintiffs' motion for summary judgment is granted in part and denied in part. The Court finds Dunhill, Esquire and Thaw, jointly and severally, liable for the withdrawal liability, plus reasonable attorney's fees and costs, interest and liquidated damages. The Court dismisses the Amended Complaint as to Sanford and Custom Stainless. Defendants' motion for protective relief is denied as moot.

## I. Background

Plaintiff National Integrated Group Pension Plan (the "Plan") is an employee benefit plan maintained for the purpose of providing retirement and related benefits to eligible participants. (Am. Compl. ¶ 4.) Thaw is the sole owner of Dunhill, Esquire and Custom Stainless. *Id.* at ¶ 15. Dunhill manufactured and sold equipment for commercial kitchens, and Esquire manufactured and sold commercial rotisseries. (Pl. 56.1 ¶ 4.) Dunhill and Esquire both employed workers but, as of 2000, Esquire's employees were transferred to Dunhill, and the employees manufactured equipment for both entities. *Id.* at ¶ 5. Sanford is a general partnership that, until September of 2004, owned the property where Dunhill and Esquire operated. (Am. Compl. ¶ 14.) That month, Sanford sold the property to a third party for approximately $5,382,745. (Pl. 56.1 ¶ 13.) Thaw, the sole partner, received the proceeds of the sale in his personal account. (Pl. 56.1 ¶ 14; Def. 56.1 ¶ 14.) Sanford marked its 2005 tax return as "final," which Defendants claim constitutes the termination of the partnership pursuant to federal tax law. (Def. 56.1 ¶ 17.) Sanford has not filed a formal dissolution. (Pl. 56.1 ¶ 17.) After the sale, Dunhill obtained a lease from the new

___
and with the consent of all parties, the Court converted their motion to a summary judgment motion. (Tr. 67:2–10.)

owner and continued doing business at the property until the end of 2008, when it ceased production entirely. (Def. Mem. 4.) Defendants claim that Custom Stainless dissolved as a New York corporation in 1992, moved to New Jersey, and ceased business entirely in the early 2000s, filing its tax return in 2003 and describing itself as "Inactive." (Def. 56.1 ¶ 16.) Plaintiffs contend that Custom Stainless has not been formally dissolved. (Pl. 56.1 ¶ 16.)

Dunhill was a participating employer in the Plan. (Am. Compl. ¶ 18.) As such, Dunhill was obligated to make contributions to fund benefits for employees covered by the Plan. *Id.* On December 31, 2008, Dunhill completely withdrew from participation in the Plan. (Pl. 56.1 ¶ 18.) Plaintiffs allege that at the time of the withdrawal, Esquire, Custom Stainless, Sanford and Thaw were under common control with Dunhill. (Am. Compl. ¶ 22.) Plaintiffs made a determination of the amount of Dunhill's withdrawal liability and made a demand for payment in a letter dated January 13, 2010. (Pl. 56.1 ¶ 21.) The letter stated that the amount of withdrawal liability was $612,512.75, and the liability should be paid in 80 quarterly payments of $7,362.75 each. *Id.* The first payment was due February 12, 2010, but Dunhill did not make a payment. *Id.* at ¶¶ 21–22. By letter dated February 22, 2010, Dunhill requested that the Plan review its determination. *Id.* at ¶ 23. On March 8, 2010, Dunhill sent a demand for arbitration to the American Arbitration Association ("AAA"). (Am. Compl. ¶ 25.) On March 22, 2010, counsel for the Plan notified Dunhill that its arbitration demand was not timely, that Dunhill had failed to provide the required withdrawal liability payment and that Dunhill would be in default unless payment was made within 60 days. (Pl. 56.1 ¶¶ 24, 28.)

Dunhill and the Plan selected an arbitrator, but a hearing date was not set. *Id.* at ¶ 29. On May 10, 2010, Claire Connelly, an AAA representative, asked the parties for an update of the status of the arbitration. *Id.* at ¶ 31. Neither party responded. (Def. 56.1 ¶ 31.) The Plan

notified Dunhill by letter dated May 24, 2010 that Dunhill was in default. (Pl. 56.1 ¶ 26.) On June 14, 2011, the AAA representative informed the parties that, unless advised to the contrary by June 24, 2011, the AAA's file would be closed. *Id.* at ¶ 31. The AAA also informed Dunhill that it had not yet paid its filing fee in full. *Id.* Neither party responded, and the AAA notified the parties on July 18, 2011 that the arbitration file had been closed. *Id.* at ¶ 32.

## II. Discussion

Defendants move for partial summary judgment, arguing that (1) Sanford, Thaw and Custom Stainless cannot be held liable under control group liability because Sanford and Custom Stainless dissolved prior to December 31, 2008, and (2) Thaw cannot be held liable through a veil piercing claim. (Def. Mem. 1–2.) Plaintiffs move for summary judgment against all Defendants for the assessed withdrawal liability and interest. (Pl. Opp'n 1.) Defendants also seek a protective order, if necessary, to stay further proceedings pending completion of arbitration proceedings. (Def. Stay Mem. 1.)

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not

sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Withdrawal Liability

The Plan is a multiemployer pension plan. Multiemployer pension plans, created by ERISA, are plans "in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 129 (2d Cir. 2012). Multiemployer pension plans are advantageous in industries where companies frequently go in and out of business and employees transfer among employers, making a single-employer plan "unfeasible." *Id.* However,

> [a] key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage — or force — further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base.

*Id.* (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n.2 (1984)). In recognition of this problem, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). *Id.* at 130. Under the MPPAA, "an employer [that] withdraws from a multiemployer plan . . . is liable to the plan in the amount determined . . . to be the withdrawal liability." 29 U.S.C. § 1381(a). "Withdrawal liability is the withdrawing employer's

proportionate share of the pension plan's unfunded vested benefits." *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 130.

### c. Dunhill

Plaintiffs move for summary judgment against Dunhill, the withdrawing employer. Employers that wish to challenge a withdrawal liability assessment must do so through a mandatory system of arbitration. 29 U.S.C. § 1401(a)(1); *see also N.Y. Teamsters Conference Pension & Ret. Fund v. Express Services, Inc. ("Express Services")*, 426 F.3d 640, 645 (2d Cir. 2005). "Where a defendant does not initiate arbitration, it waives its right to arbitration and its right to assert any defenses in an action seeking withdrawal liability," and the "withdrawal liability assessed against the defendant becomes fixed." *Finkel v. Fred Todino & Sons, Inc.*, No. 08 Civ. 4598, 2010 WL 4646493, at *4 (E.D.N.Y. Oct. 8, 2010), *report and recommendation adopted*, 2010 WL 4673961 (E.D.N.Y. Nov. 3, 2010); *see also Labarbera v. United Crane & Rigging Services, Inc.*, No. 08 Civ. 3274, 2011 WL 1303146, at *5 (E.D.N.Y. Mar. 2, 2011) (noting that the "law is unforgiving where, as here, an employer fails to take action in a timely manner after being notified"). The statute provides that if an arbitration proceeding has not been initiated in the prescribed time period, the amounts demanded by the plan are "due and owing on the schedule set forth by the plan sponsor" and the "plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." 29 U.S.C. § 1401(b)(1). In order to prevail on summary judgment, a plaintiff must establish three elements: "(1) that defendants constituted an 'employer' under MPPAA prior to the withdrawal; (2) that defendants received notice of a withdrawal liability assessment against them; and (3) that defendants failed to initiate arbitration as required by MPPAA." *Bd. of Trustees of Trucking Emps. of N. Jersey Welfare Fund, Inc.–Pension Fund v. Canny ("Canny")*, 900 F. Supp. 583, 592 (N.D.N.Y. 1995); *see*

*Labarbera*, 2011 WL 1303146, at *5 ("[A]n employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan, even in the absence of documentation as to how the figure was calculated.").

Dunhill was an employer under the MPPAA prior to withdrawal and received proper notification of its withdrawal liability. (Pl. 56.1 ¶ 21.) Dunhill initiated arbitration proceedings but then abandoned those proceedings. *Id.* at ¶¶ 31–32. Defendants do not oppose Plaintiffs' summary judgment motion with respect to Dunhill. (Tr. 3:5–11.) Plaintiffs' motion for summary judgment is granted with respect to Dunhill. *See Labarbera*, 2011 WL 1303146, at *5 ("Any dispute concerning the plan's assessment of liability had to be settled through arbitration, and an employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan, even in the absence of documentation as to how the figure was calculated.").

### d. Commonly Controlled Group

Plaintiffs move for summary judgment against Esquire, Custom Stainless, Sanford and Thaw, arguing that they are jointly liable as commonly controlled entities.[2] (Pl. Opp'n 20.) Sanford, Custom Stainless and Thaw[3] claim that they were no longer members of the controlled

---

[2] Defendants do not oppose Plaintiffs' summary judgment motion with respect to Esquire. (Tr. 3:5–11.) Accordingly, the Court finds that Esquire, as a member of the commonly controlled group, is liable for Dunhill's withdrawal liability. *UNITE Nat'l Ret. Fund*, 2009 WL 2025163, at *5.

[3] An individual, who owns an unincorporated partnership or proprietorship that is part of a commonly controlled group, is "himself deemed a member of the commonly controlled group for purposes of withdrawal liability." *See Labarbera v. United Crane & Rigging Servs., Inc.*, No. 08 Civ. 3274, 2011 WL 1303146, at *2 (E.D.N.Y. Mar. 2, 2011) ("Smith was the sole owner of Unique and of the property Unique used, and he and Unique therefore constitute a trade or business under common control for withdrawal liability purposes."); *UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, No. 04 Civ. 9869, 2009 WL 2025163, at *5 (S.D.N.Y. July 13, 2009)

group at the time of withdrawal and, therefore, also move for summary judgment. (Def. Mem. 1–2.) Under the MPPAA, "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 285 (2d Cir. 2010) (quoting *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 86 (2d Cir. 1997)); *see* 29 U.S.C. § 1301(b)(1) ("[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."); *Canny*, 900 F. Supp. at 589 ("Because a commonly controlled group of trades or businesses is to be treated as a single employer, each member of such a group is liable for the withdrawal of any other member of the group.").

The parties do not dispute that Thaw owns or owned 100 percent of Dunhill, Esquire, Sanford and Custom Stainless, (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12), or that Esquire, Custom Stainless, Sanford and Thaw were at one point in time members of a commonly controlled group. *See* 26 C.F.R. § 1.414(c)-2(c) ("The term 'brother-sister group of trades or businesses under common control' means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own . . . a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.")); *UNITE Nat'l Ret. Fund v. Veranda Mktg. Co.*, No.

_____

(finding that an individual defendant, as the sole proprietor of an unincorporated business, is under common control and is "personally liable for [the] business debts"). Sanford is an unincorporated partnership, and, therefore, if Sanford is a member of the commonly controlled group, Thaw is as well.

04 Civ. 9869, 2009 WL 2025163, at *5 (S.D.N.Y. July 13, 2009) (where an individual was the sole owner of various businesses, those businesses were a "brother-sister" group under the individual's common control). Defendants claim that Sanford and Custom Stainless ceased to be trades or businesses within the meaning of § 1301(b)(1) prior to Dunhill's withdrawal. (Def. Mem. 1–2.) Plaintiffs contend that any argument regarding the continued membership of Sanford and Custom Stainless is subject to the MPPAA's mandatory arbitration provision and, therefore, has been waived because Defendants abandoned the arbitration proceedings. (Pl. Opp'n 8.) Plaintiffs also claim that Defendants' argument fails on the merits because neither Sanford nor Custom Stainless ever formally dissolved. *Id.* For the following reasons, the Court finds that Defendants have not waived this argument and that, at the time of withdrawal, Custom Stainless, Sanford and Thaw were no longer members of the controlled group.

### i. Mandatory Arbitration Provision

The MPPAA provides in relevant part that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration."[4] 29 U.S.C. § 1401(a)(1). The MPPAA does not completely bar federal jurisdiction and "under certain circumstances the parties are not required to submit their dispute to the arbitrator first." *Rao v. Prest Metals*, 149 F. Supp. 2d 1, 6 (E.D.N.Y. 2001) (citing *T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir. 1985)). The Second Circuit has held that arbitration is not required "when the only disputes implicate constitutional questions or a matter of statutory

---

[4] These provisions cover a broad array of issues related to the establishment of withdrawal liability, determination and collection of liability, what constitutes a complete withdrawal, attempts to evade or avoid liability, partial withdrawals, adjustment for partial withdrawals, reduction or waiver of withdrawal liability, reduction of partial withdrawal liability, and notice and collection of withdrawal liability. *See* 29 U.S.C. §§ 1381–1399.

interpretation outside the range of issues that Congress directed to arbitration." *Trustees of Amalgamated Ins. Fund v. Steve Petix Clothier, Inc.*, No. 03 Civ. 4530, 2004 WL 67480, at *5 n.5 (S.D.N.Y. Jan. 15, 2004) (citing *N.Y. Teamsters Conference Pension & Ret. Fund v. McNicholas Transp. Co.*, 848 F.2d 20, 22 (2d Cir. 1988)); *see also T.I.M.E.–DC*, 756 F.2d at 945; *Rao*, 149 F. Supp. 2d at 6 ("[I]f the dispute is not solely over factual issues, but instead involves a constitutional question or, in some cases, a matter of statutory interpretation, it need not necessarily be resolved by an arbitrator."). In *T.I.M.E.–DC*, the Second Circuit stated that "there is no indication that Congress contemplated that § 1401(a)(1) would empower an arbitrator to make decisions outside the context of sections 1381 through 1399." 756 F.2d at 945; *see also Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 262 (2d Cir. 1990) (stating that "'any dispute' concerning the *notice or amount* of withdrawal liability 'shall be resolved through arbitration.'" (emphasis added)).

In recognition of the policies underlying the arbitration requirement, the Second Circuit established an exception to arbitration only when the following criteria are met: "(1) there must be no unresolved questions of fact or issues of contract interpretation; (2) review must be judiciously economical; and (3) the issue must fall 'outside the scope of those issues that Congress directed to the arbitrator, that is, those determinations made under 29 U.S.C. §§ 1381– 1399 pursuant to 29 U.S.C. § 1401(a)(1).'" *Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 807–08 (2d Cir. 1994) (quoting *T.I.M.E.–DC*, 756 F.2d at 945); *see also NYSA-ILA Pension Trust Fund v. Am. Stevedoring, Inc.*, No. 12 Civ. 2506, 2013 WL 1234957, at *3 (S.D.N.Y. Mar. 26, 2013) ("In determining the issues suitable for arbitration, courts look to whether the policies behind arbitration are implicated. These policies include: (1) the application of the

administrative body's superior expertise; (2) promotion of judicial economy; and (3) deference to the statutory scheme Congress created."  (citation and internal quotation marks omitted)).

In addition, the issue of whether an entity is an employer within the meaning of the MPPAA is a "'threshold legal issue' requiring 'judicial resolution,' since an entity that is not an employer cannot, under the MPPAA, be required to arbitrate."  *Express Services*, 426 F.3d at 645 (quoting *Transportacion Maritima Mexicana*, 901 F.2d at 261).  However, "courts have drawn a distinction between disputes over (1) whether the defendant was ever an employer obligated under the MPPAA to make payments to the plaintiff pension fund, and (2) whether the defendant ceased to have that obligation before the payments in question became due."  *Id.* at 646.  In addressing this distinction, courts "have uniformly held that the former question is for the court, while the latter is for the arbitrator," recognizing that continued employer status, as opposed to per se employer status, implicates the enumerated provisions in § 1401.  *Id.* (collecting cases); *see 666 Drug, Inc. v. Trustee of 1199 SEIU Health Care Emps. Pension Fund*, No. 12 Civ. 1251, 2012 WL 1142464, at *1 (S.D.N.Y. Apr. 4, 2012) ("[A]n arbitrator must decide disputes about 'continued employer status,' which concerns when a party ceased being an employer under MPPAA."  (citation omitted)); *Canny*, 900 F. Supp. at 594 ("Whether the 'controlled group' continued until the date of withdrawal and whether defendants tried to 'evade or avoid' would have been factual matters for an arbitrator, had arbitration been initiated.  The Court does not rule on the merits of such claims at all.").

The Second Circuit adopted this distinction in *Express Services*, holding that the court's jurisdiction over employer-status determinations is "limited to cases involving disputes over employer status per se, *i.e.*, disputes as to whether the company was ever an employer obligated to make payments to the plaintiff fund."  426 F.3d at 646.  The court found that the district court

properly declined to send the issue to arbitration because the defendants denied ever becoming employers for MPPAA purposes. *Id.* at 647. The court further stated that arbitration would be inappropriate because the dispute involved whether the appellees were under common control with the employer that withdrew, and, therefore, the dispute did not fall under one of the sections enumerated in § 1401(a). *Id.* at 647–48. ("Common-control liability is established in § 1301, which does not fall within § 1401(a)'s enumerated range."). Thus, the court concluded that "[b]ecause the parties disputed whether [the defendants] had ever become employers under the MPPAA and because their dispute did not fall under provisions enumerated in § 1401(a), the arbitration requirement of that provision did not apply." *Id.* at 648.

Plaintiffs maintain that *Express Services* should be read broadly in light of the existing case law to require arbitration for any dispute concerning "continued employer status," regardless of whether the dispute implicates the enumerated provisions. *See, e.g.*, *I.L.G.W.U. Nat'l Ret. Fund v. ESI Group, Inc.*, No. 92 Civ. 0597, 2002 WL 999303, at *5 (S.D.N.Y. May 15, 2002) ("The determination of the factual issue of whether defendants had ceased to be an MPPAA employer before the date of withdrawal . . . is an issue for arbitration."), *aff'd sub nom. I.L.G.W.U. Nat'l Ret. Fund v. Meredith Grey, Inc.*, 94 F. App'x 850 (2d Cir. 2003); *Canny*, 900 F. Supp. at 593 ("All factual disputes, such as whether defendants remained an 'employer' at the time of the withdrawal, are reserved for an arbitrator because of the 'exhaustion of administrative remedies' doctrine."). However, the cases Plaintiffs cite involve factual disputes affecting determinations that must be made under the enumerated provisions.[5] *See Chicago Truck Drivers*

---

[5] Plaintiffs cite *Trustees of United Mine Workers of America 1974 Pension Plan v. Old Mill Mining Co.*, an analogous case in which the defendant conceded that he had at one point been a member of the commonly controlled group, but argued that he had gone out of business prior to the withdrawal and was, therefore, no longer a member of the commonly controlled group. 847 F. Supp. 173, 175–76 (D.D.C. 1994). The court found that, although the issue of

*v. El Paso Co.*, 525 F.3d 591, 597 (7th Cir. 2008) (the defendant's continued employer status depended on a determination of whether the merger was designed to "evade or avoid"[6] withdrawal liability); *666 Drug, Inc.*, 2012 WL 1142464, at *1 (finding that "factual issues lie at the root of Plaintiff's dispute that turn upon when Plaintiff completely withdrew from Defendant's fund within the meaning of §§ 1381, 1383 and if Defendant gave Plaintiff notice 'as soon as practicable' as required by § 1399(b)"); *I.L.G.W.U. Nat'l. Ret. Fund*, 2002 WL 999303, at *7 (the determination of whether the transaction that allegedly dissolved the commonly controlled group was valid or was designed to evade or avoid liability was a question of fact to be decided by the arbitrator); *Cent. States, Se. & Sw. Areas Pension Fund v. Rogers*, 843 F. Supp. 1135, 1145 (E.D. Mich. 1992) (in order to determine whether the defendant was still a member of the controlled group at the time of withdrawal, the court would have to resolve factual issues related to determinations to be made under §§ 1383 and 1385, which "are precisely the type of factual disputes an arbitrator skilled in such matters should decide"), *aff'd*, 14 F.3d 600 (6th Cir. 1993).

---

whether an employer was *ever* a member of the controlled group was an issue for the court, an employer, having conceded that it was once a member of the controlled group must go to arbitration to challenge its status at the time of withdrawal. *Id.* at 176. The court did not specifically articulate which of the enumerated provisions supported such a result, stating only that the defendant had failed to cite any case that states that such a dispute does *not* fall under the enumerated provisions, noting in a footnote that "29 U.S.C. §§ 1381–99 cover the full range of employer withdrawal liability, with section titles such as 'Determination and Collection of Liability; Notification of Employer' and 'Reduction or Waiver of Complete Withdrawal Liability; Procedures and Standards Applicable.'" *Id.* at 175 & n.3. In referencing the enumerated provisions generally, the court recognized that even a continued employer status dispute must implicate one of the enumerated provisions in order to compel arbitration. However, none of the provisions address whether a business that has ceased to operate is still a trade or business within the meaning of § 1301.

[6] The "evade or avoid" provision provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c).

Similarly, multiple circuits have held that arbitration is appropriate "as long as a withdrawing entity was a part of the control group of an employer subject to the MPPAA at some point in time," and "the issues in dispute fall under provisions explicitly designated for arbitration." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 123 (4th Cir. 1991) (emphasis omitted); *see Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1247 (3d Cir. 1987) ("We conclude that where the party against which withdrawal liability is being asserted was certainly part of the controlled group of an employer subject to MPPAA at some point in time, and where the issues in dispute fall within the purview of MPPAA provisions that are explicitly designated for arbitration, the Act's dispute resolution procedures must be followed."); *see also Banner Indus., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir. 1989) (adopting the holding of *Flying Tiger*). In *Flying Tiger*, the Third Circuit found that the issue of whether the corporation ceased to be a MPPAA employer in time to avoid liability "unavoidably raises an 'evade or avoid' issue under section 1392(c)." 830 F.2d at 1250. The Third Circuit noted that, generally, disputes regarding continued employer status will be subject to arbitration because "[a]ny such employer will, under MPPAA section 1381, be assessed withdrawal liability unless that employer satisfies a statutory provision relieving it of liability." *Id.* at 1250.

Although continued employer status is generally an issue for arbitration, the case law does not support a conclusion that arbitration is mandatory even if the dispute does not implicate any of the provisions set forth in § 1401(a). In *Express Services*, the Second Circuit specifically stated that § 1401(a) did not apply because "this case does not involve a dispute over a determination under one of the provisions enumerated in that section." 426 F.3d at 647–48; *see also id.* at 646 (adopting the Seventh Circuit's holding that the issue of continued employer

14

status "is an arbitrator's issue because its resolution hinges upon applying the MPPAA provisions concerning employer withdrawals specifically assigned by Congress to the arbitrator's purview").  This conclusion is consistent with the exemption previously recognized by the Second Circuit, allowing a dispute to be resolved by the court if there are no factual disputes, resolution by the court will promote judicial economy and none of the enumerated provisions are implicated.  *Bowers*, 27 F.3d at 807–08; *T.I.M.E.–DC*, 756 F.2d at 945.  The Court finds that all three of these criteria are met in the instant action.

The parties do not dispute that Sanford and Custom Stainless stopped doing business no later than 2005 and 2003, respectively.  (Def. 56.1 ¶¶ 16–17.)  Plaintiffs argue, instead, that Sanford and Custom Stainless remained members of the controlled group because neither business formally dissolved.  (Pl. 56.1 ¶¶ 16–17.)  Thus, this action does not require the resolution of any factual disputes but rather a determination of whether an inactive corporation that has not formally dissolved is a "trade or business" within the meaning of § 1301(b)(1).  A dispute regarding whether or not an entity is under common control does not implicate any of the enumerated provisions.  *Express Services*, 426 F.3d at 647.  Courts, therefore, have found that the determination of whether defendants are part of a commonly controlled group is for the courts to decide.  *I.L.G.W.U. Nat'l Ret. Fund*, 2002 WL 999303, at *5; *see also Trustees of Local 138 Pension Fund v. Tax Trucking Co.*, No. 09 Civ. 3041, 2012 WL 1886787, at *3 (E.D.N.Y. Apr. 17, 2012) ("The threshold question for determining withdrawal liability under ERISA, therefore, is determining which entities form the 'single employer' subject to withdrawal liability."), *report and recommendation adopted*, 2012 WL 1890239 (E.D.N.Y. May 23, 2012); *Nat'l Pension Plan of the UNITE HERE Workers Pension Fund v. Swan Finishing Co., Inc.*, No. 05 Civ. 6819, 2006 WL 1292780, at *2–3 (S.D.N.Y. May 11, 2006) (finding that the defendant is

a "trade and business" as defined by 29 U.S.C. § 1301 and, therefore, is jointly and severally liable). Moreover, the Court's resolution of this issue would be in the interest of judicial economy because the parties have fully briefed the issue, and this matter has been pending for almost two years. Accordingly, the Court finds that the instant dispute is exempt from the mandatory arbitration provision.

### ii. Merits

Plaintiffs argue that Sanford and Custom Stainless were still "trades and businesses" under common control at the time of withdrawal because they never formally dissolved and, therefore, are subject to withdrawal liability. (Pl. Opp'n 11–12.) Although Defendants argue that Sanford was effectively dissolved when it filed a tax return marked "final," there is no dispute that Sanford failed to take any steps to formally dissolve. (Pl. 56.1 ¶ 17; Def. 56.1 ¶ 17.) Thaw testified at his deposition that Sanford filed its final tax return in 2006, and his understanding from his accountant "was that in New York City once you file a final tax return in New York State that acts as a dissolution if there's nothing filed for three years after that." (Pl. 56.1 ¶ 17.) Plaintiffs argue that even under Defendants understanding, Sanford was not dissolved until three years after the filing of the final tax return, which would be after the withdrawal. (Pl. Opp'n 12; Pl. 56.1 ¶ 17.) Similarly, Plaintiffs argue that Defendants have admitted that they did not take any formal steps to dissolve Custom Stainless. (Pl. 56.1 ¶ 16.) Defendants have provided a document from the New York Division of Corporations, which indicates that as of February 11, 1994 the status of Custom Stainless was "INACTIVE – Dissolution." (Thaw Decl. Ex. A.)

The MPPAA provides that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single

employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b)(1). The

MPPAA does not define "trade or businesses" but incorporates the Internal Revenue Code

standard for determining whether two related corporations are under common control. *See* 29

U.S.C. § 1301(b)(1) ("The regulations prescribed under the preceding sentence shall be

consistent and coextensive with regulations prescribed for similar purposes by the Secretary of

the Treasury under section 414(c) of Title 26."); *IUE AFL-CIO Pension Fund v. Barker &*

*Williamson, Inc.*, 788 F.2d 118, 123 (3d Cir. 1986) ("ERISA incorporates the Internal Revenue

Code's 'controlled group' standards for determining whether two related corporations are within

a controlled group and therefore deemed to be a single employer."); *Nat'l Pension Plan of the*

*UNITE HERE Workers Pension Fund*, 2006 WL 1292780, at *2–3. Thus, in determining

whether an entity is the member of a controlled group, "courts have held that the 'appropriate

starting point for this analysis' is the test enunciated by the Supreme Court in *Commissioner of*

*Internal Revenue v. Groetzinger*, [480 U.S. 23 (1987),] defining trade or business for purposes of

section 162(a) of the Internal Revenue Code." *Nat'l Pension Plan of the UNITE HERE Workers*

*Pension Fund*, 2006 WL 1292780, at *2; *see also NYSA-ILA Pension Trust Fund v. Lykes Bros.,*

*Inc.*, No. 96 Civ. 5616, 1997 WL 458777, at *5 (S.D.N.Y. Aug. 11, 1997) ("Neither the MPPAA

nor ERISA define the term 'trades or businesses.' The definition of 'trade or business'

articulated by the Supreme Court in the context of the Internal Revenue Code in *Commissioner*

*of Internal Revenue v. Groetzinger*, 480 U.S. 23, 107 S. Ct. 980, 94 L.Ed.2d 25 (1987), is the

appropriate starting point for this analysis.").

　　　　Under *Groetzinger*, in order to be engaged in a trade or business, "the taxpayer must be

involved in the activity with continuity and regularity and . . . the taxpayer's primary purpose for

engaging in the activity must be for income or profit." *Groetzinger*, 480 U.S. at 35. In addition

to *Groetzinger*, courts look to the purposes of ERISA and the MPPAA in order to determine whether an entity is a trade or business. *Nat'l Pension Plan of the UNITE HERE Workers Pension Fund*, 2006 WL 1292780, at *3 n.35; *NYSA-ILA Pension Trust Fund*, 1997 WL 458777, at *6 ("Beyond this articulation of the test in *Groetzinger*, it is useful to look to the purposes of ERISA and the MPPAA."); *ILGWU Nat'l Ret. Fund v. Minotola Indus., Inc.*, No. 88 Civ. 9131, 1991 WL 79466, at *3–4 (S.D.N.Y. May 3, 1991) (looking both to *Groetzinger* and the purpose of the control group rule in determining whether an entity is a "trade and business" under the MPPAA). "The policy of § 1301(b)(1) is to prevent a company from avoiding liability by shifting its assets into other businesses under its control." *Gov't Dev. Bank for Puerto Rico v. Holt Marine Terminal, Inc.*, No. 02 Civ. 7825, 2004 WL 2062542, at *5 (E.D. Pa. Sept. 14, 2004); *see also NYSA-ILA Pension Trust Fund*, 1997 WL 458777, at *6 ("When Congress defined all members of a controlled group as a single 'employer,' it clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations.").

The parties do not dispute that Sanford and Custom Stainless ceased activity prior to the withdrawal. (Pl. 56.1 ¶¶ 15–16; Def. 56.1 Resp. ¶¶ 15–16.) Sanford filed its final tax return in 2006, and Custom filed its final tax return in 2003. *Id.* Plaintiffs have not provided and the Court has not found any case law to support their claim that Sanford and Custom Stainless remained businesses under common control within the meaning of § 1301 until they *formally* dissolved.[7] Sanford and Custom Stainless stopped doing any business and effectively dissolved

---

[7] Plaintiffs cite *NYSA-ILA Pension Trust Fund v. Lykes Bros., Inc.*, No. 96 Civ. 5616, 1997 WL 458777 (S.D.N.Y. Aug. 11, 1997), for the proposition that an "effectively" dissolved company is still a trade or business for the purposes of MPPAA liability. 1997 WL 458777, at *7. *NYSA-ILA Pension Trust Fund* is distinguishable for two reasons. First, the court noted that "[w]hile Lykes Lines may currently have no assets, this does not mean that it was not a trade or

over two years prior to the withdrawal.  There is no allegation that any assets of these companies were shifted or hidden in order to avoid liability.  *Gov't Dev. Bank for Puerto Rico*, 2004 WL 2062542, at *5 (noting that § 1301(b)(1) is intended to prevent companies from shifting assets in order to avoid liability).  The Court finds that Sanford and Custom Stainless were effectively dissolved at the time of the withdrawal and, therefore, were no longer members of the commonly controlled group.  *See Teamsters Pension Trust Fund of Philadelphia v. Brigadier Leasing Assoc.*, 880 F. Supp. 388, 400 (E.D. Pa. 1995) (holding that "a partnership does not incur MPPAA withdrawal liability triggered by the withdrawal of another organization where the withdrawal occurs after the dissolution of the partnership and where the partnership's business after the dissolution date is limited to winding up the affairs of the partnership.").  Accordingly, Defendants' motion for summary judgment is granted with respect to Sanford and Custom Stainless, and Plaintiffs' motion for summary judgment is denied with respect to Sanford and Custom Stainless.

### e.  Veil Piercing

Plaintiffs move for summary judgment against Thaw under a veil piercing theory.[8]  Thaw

---

business at the relevant time — when LBS withdrew from its obligations to the Fund."  *Id.*  In the instant case, Sanford and Custom Stainless had ceased any activity at least two years before Dunhill withdrew.  Second, in *NYSA-ILA Pension Trust Fund*, the defendants argued that it was effectively a dissolved company because it had no assets.  *Id.*  The court rejected this argument, noting that "by definition corporations under common control with employers who are withdrawing from their contribution obligations are likely to be in financial straights."  *Id.*  In other words, a corporation could not argue it was effectively dissolved and avoid withdrawal liability simply because it lacked assets.  Here, Defendants contend that Sanford and Custom Stainless were effectively dissolved because, among other things, they had been inactive for years before the withdrawal, not because they had no assets.

[8] As previously discussed, Defendants' motion for judgment on the pleadings was converted to a motion for summary judgment at oral argument.  It is unclear whether Defendants intended that their entire motion be converted or only as to the issue of whether or not Sanford and Custom Stainless were members of the controlled group.  In Defendants' motion, they argue

argues that questions of fact preclude summary judgment.[9]  (Def. Reply 22.)  The Second Circuit

has recognized that in order to protect employee benefits, "courts observe 'a general federal

policy of piercing the corporate veil when necessary.'"  *Ret. Plan of UNITE HERE Nat'l Ret.*

*Fund*, 629 F.3d at 288 (quoting *Express Services*, 426 F.3d at 647).  Under New York law,

piercing the corporate veil requires a showing that:  "(1) the owners exercised complete

domination of the corporation in respect to the transaction attacked; and (2) that such domination

_____

that Plaintiffs allegations related to veil piercing are "too skeletal and too conclusory to pass
muster under Rule 12(c)."  (Def. Mem. 2.)  The standard of review for a Rule 12(c) motion is the
same as the standard used for a Rule 12(b)(6) motion.  *Bank of N.Y. v. First Millennium, Inc.*,
607 F.3d 905, 922 (2d Cir. 2010).  In reviewing a motion to dismiss, the court must "accept as
true all allegations in the complaint and draw all reasonable inferences in favor of the non-
moving party*." Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011)
(quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  Plaintiffs
allege that Thaw owned 100 percent of Dunhill, Esquire, Sanford and Custom Stainless, (Am.
Compl. ¶ 15); disregarded and abused the corporate form, *id.* at ¶ 17; made the decision to
withdraw from the Plan and not to pay any portion of the withdrawal liability, *id.* at ¶¶ 20, 29;
used the corporate accounts of Dunhill and Esquire to pay personal expenses, *id.* at ¶ 35; lent
funds to Dunhill or Esquire and received loans from Dunhill or Esquire without any
documentation, *id.* at ¶ 38; did not maintain any documents related to Dunhill or Esquire's
election of directors, minutes of meetings of the board of directors, distribution of dividends or
minutes of meetings of shareholders, *id.* at ¶ 39; and failed to file required statements with the
New York State Division of Corporations, *id.* at ¶ 40.  Plaintiffs have adequately pled a veil
piercing claim.  To the extent that Defendants maintain their motion for judgment on the
pleadings with respect to the veil piercing claim, that motion is denied.

[9] Defendants also argue that the Court does not have jurisdiction over Plaintiffs' veil
piercing claim.  (Def. Mem. 2.)  In support of this argument, Defendants cite *Peacock v. Thomas*,
where the Supreme Court held that "[p]iercing the corporate veil is not itself an independent
ERISA cause of action, but rather is a means of imposing liability on an underlying cause of
action."  516 U.S. 349, 353–54 (1996) (internal quotation marks omitted).  The Court stated that
"[e]ven if ERISA permits a plaintiff to pierce the corporate veil to reach a defendant not
otherwise subject to suit under ERISA, [the plaintiff] could invoke the jurisdiction of the federal
courts only by independently alleging a violation of an ERISA provision or term of the plan."
*Id.* at 354.  In the instant action, Plaintiffs have invoked jurisdiction by alleging ERISA
violations against Dunhill, Esquire, Custom Stainless, Sanford and Thaw.  Moreover, the Court
has supplemental jurisdiction as Plaintiffs have maintained their claims against Dunhill and were
not required to plead supplemental jurisdiction.  *See Nilsen v. Prudential-Bache Sec.*, 761 F.
Supp. 279, 293 (S.D.N.Y. 1991) ("[T]here is no need specifically to plead pendent jurisdiction
when it is clear that plaintiff's federal and state claims derive from a 'common nucleus of
operative fact.'").

was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 386 F. Supp. 2d 461, 464 (S.D.N.Y. 2005) (quoting *Morris v. N.Y. Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141 (1993)).

The court considers ten factors in determining whether the first requirement — domination — has been met:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*JSC Foreign Econ. Ass'n Technostroyexport*, 386 F. Supp. 2d at 464–65 (quoting *Wm. Passalacqua Builders, Inc. v. Resnick*, 933 F.2d 131, 139 (2d Cir. 1991)). If the domination requirement is met, the plaintiff must then fulfill the second requirement by showing (1) "the existence of a wrongful or unjust act toward that party," and (2) that "the act caused that party's harm." *JSC Foreign Econ. Ass'n Technostroyexport*, 386 F. Supp. 2d at 465. "The party seeking to pierce the corporate veil must establish that the owners of the corporation, through their domination of the corporation, 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene.'" *Id.* (quoting *Morris*, 82 N.Y.2d at 142); *see also MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 64 (2d Cir. 2001) ("Without a finding that the domination

occurred for the purpose of committing a wrong, the second element of a veil-piercing analysis has not been met.").

### i. Domination

The undisputed evidence establishes that Thaw dominated Esquire and Dunhill. Neither Dunhill nor Esquire maintained even the most basic corporate formalities.[10] (Pl. 56.1 ¶¶ 39–40; Def. 56.1 ¶¶ 39–40.) Thaw acted as sole director for both entities, neither of which elected directors or kept board minutes.[11] (Pl. 56.1 ¶ 41; Def. 56.1 ¶ 41.) Defendants did not produce any documents in the course of discovery indicating that Dunhill or Esquire had filed the biennial statements required to be filed with the New York Department of State. *Id.* at ¶ 41. Thaw regularly used the corporate credit cards to charge personal expenses. The following personal charges, among others, are undisputed: Thaw's synagogue membership, *id.* at ¶ 51; home furnishings and garden products, *id.* at ¶ 52; gym membership, *id.* at ¶ 56; cable television, bottle water and trash pick-up for his home in Connecticut, *id.* at ¶¶ 60, 62, 63; purchase of

---

[10] In responding to Plaintiffs' 56.1 statement, Defendants state that "[t]he Dunhill corporate book has been located and a copy is being provided to Plaintiffs together with the Defendants' service of opposition papers to Plaintiffs' motion for summary judgment." (Def. 56.1 ¶ 39.) Plaintiffs argue that the corporate book is inadmissible, as Defendants failed to produce it during discovery and Defendants indicated in their response to Plaintiffs' discovery request that Dunhill did not have a corporate book. (Pl. Reply 7–8.) Even if the Court were to consider the corporate book as evidence, it would not change the outcome. As discussed in detail below, not only did Dunhill and Esquire have few, if any, corporate formalities, but Thaw exerted complete control over Dunhill and Esquire, using the corporate credit cards to pay his personal expenses. The undisputed facts demonstrate that Thaw had complete domination over Dunhill and Esquire.

[11] Thaw claims that he would regularly meet with his accountants to review business matters and "[t]hese sessions were akin to annual meetings." (Def. Reply 3.) Thaw's meetings with his accountant, during which they would go through his personal charges on his corporate card and determine what he owed the company, do not constitute corporate formalities. (Pl. 56.1 ¶ 70; Def. 56.1 ¶ 70.) *See Winchester Global Trust Co. Ltd. v. Donovan*, 880 N.Y.S.2d 877, at *5 (Sup. Ct. 2009) (rejecting the defendant's claim that its "informal" board meetings constituted corporate formalities).

tickets and related travel expenses for Thaw, his wife and his sons for dozens of trips between 2008 and 2011, *id.* at ¶ 55; payment of medical and dental bills, *id.* at ¶¶ 59, 61; payment of children's tuition, *id.* at ¶ 53; movie tickets, sporting events and shows, *id.* at ¶ 68; meals on a regular basis, *id.* at ¶ 69; groceries and liquor stores, *id.* at ¶ 67; and personal and family cellphone plans, *id.* at ¶ 66.

Thaw testified that he reimbursed Dunhill for all of his personal expenses. *Id.* at ¶ 70 ("I would meet with the accountant and . . . we would go through it and he had a percentage that he would charge back as income to me. . . . I basically told him what was income and what was not."). Thaw provided a handwritten list of figures, admittedly created in 2012 for the purposes of this litigation, and claims that this list represents his reimbursement to the companies of his personal expenses. (Pl. 56.1 ¶ 73; Thaw Supp. Decl. Ex. K.) Attached to the list are copies of personal checks from Thaw to Dunhill, each of which contains the notation "loan" on the memo line. (Pl. 56.1 ¶¶ 71–72; Thaw Supp. Decl. Ex. K.) The checks are all round numbers and do not correspond to any specific expenditures.[12] (Thaw Supp. Decl. Ex. K.) Defendants provided a supplemental declaration from Thaw, which included multiple tables purported to itemize Thaw's charges and reimbursements from 2007 to 2011. (Thaw Supp. Decl. ¶¶ 37–39.) According to the tables, Thaw charged $332,825.72 in personal expenses to the corporate credit cards but only reimbursed Dunhill $324,000. *Id.* Defendants do not cite to any documents or testimony that provide the basis for these tables. Furthermore, the information provided in Thaw's supplemental declaration contradicts the information previously provided to Plaintiffs

---

[12] Defendants argue that Thaw's use of the corporate credit card was proper. (Def. Reply 22.) Defendants claim that Thaw's "practice and perks were consistent with those of many private business owners, who traditionally have use of a company car, medical insurance and a company credit card." *Id.* However, these charges were not merely business expenses or "perks" but were informal loans, using the company credit to pay significant personal expenses such as tuition for his children. (Pl. 56.1 ¶¶ 51–68.)

during discovery.  The checks and handwritten table, which Defendants had previously produced, only show $269,000 in reimbursements, not the $324,000 Defendants now claim. (Thaw Supp. Decl. Ex. K.)

Even under Thaw's most recent accounting, he charged almost $9,000 more than he reimbursed and did not pay any interest.  (Thaw Supp. Decl. ¶¶ 37–39.)  Defendants concede that in 2009 and 2010, Thaw did not reimburse Dunhill for the total amount of the personal expenses he charged.  (Thaw Supp. Decl. Ex. K.)  Although the parties dispute the extent to which Thaw reimbursed the companies, the parties do not dispute that Thaw used the corporate credit cards to pay personal expenses.  Even if the Court accepts Thaw's claim that he reimbursed the companies for the majority of his personal expenses, his use of corporate credit cards to pay over $300,000 in personal expenses is evidence of domination.  *See Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 283 (S.D.N.Y. 2006) ("A general practice of diverting revenues and commingling funds is sufficient to show alter ego liability, because it indicates, for financial purposes at least, total disregard of the corporate form.").  Moreover, even if Thaw reimbursed the companies for the majority of his expenses, Thaw failed to put sufficient money into the corporations to satisfy their debts or regular expenses, leaving Dunhill and Esquire inadequately capitalized.  (Pl. 56.1 ¶ 74; Def. 56.1 ¶ 74.)

During all relevant times, Thaw was the sole officer and director of Dunhill and Esquire. (Pl. 56.1 ¶¶ 37–38, 44; Def. 56.1 ¶¶ 37–38, 44.)  Dunhill and Esquire did not have any business discretion independent of Thaw.  (Pl. 56.1 ¶ 44 ("I was responsible as President for everything, sales and marketing, and the administrative and financial responsibilities. . . .  I had a factory foreman who ran the factory.  I didn't actually run the factory itself, but I ran everything on the business side of the company.").  Thaw was the only individual with signature authority for the

corporate entities, the only one with authority to make withdrawals, and the only one, since at least 2009, with authority to charge on the corporate credit cards. *Id.* at ¶ 45. As made clear by Thaw's use of the corporate credit cards and his informal "loans," Thaw did not deal with any of his companies at arm's length. (Pl. Opp'n 30.)

Based on the above evidence, the undisputed facts demonstrate that Thaw exercised complete domination over Dunhill and Esquire.[13] *See Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 97–98 (2d Cir. 1997) (finding sufficient evidence of domination where the corporation did not have any formal shareholders' meetings, did not maintain records of any directors' meetings, the defendant was the sole shareholder and director of the corporation "issued over $700,000 in loans to [the defendant] without any identified corporate purpose, loans which [the defendant] used in part to support his daughter and to pay his mistress's gambling debts" and the corporation loaned over five million dollars to other corporations that defendant owned); *Bogosian v. All Am. Concessions*, No. 06 Civ. 1633, 2011 WL 4460362, at *6–7 (E.D.N.Y. Sept. 26, 2011) (finding the undisputed facts established the shareholder's domination because the corporation "observed few, if any, corporate formalities," failed to file with the state the required annual reports, had no business discretion independent of the shareholder's will and entered into the contract at issue because of the shareholder's actions); *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, 724 F. Supp. 2d 308, 319 (E.D.N.Y. 2010) ("Even without a definitive

---

[13] The Court notes that Thaw's abuse of corporate funds is predominantly related to Dunhill's credit cards and bank accounts, although he leased a car in Esquire's name and used Esquire's bank accounts to make the monthly payments from 2007 through part of 2009. (Pl. 56.1 ¶ 64.) Esquire transferred all of its employees to Dunhill prior to 2000, and the record is not clear to what extent Esquire maintained bank accounts and records independent of Dunhill. *Id.* at ¶ 4. In any event, the parties do not dispute that Esquire was wholly owned by Thaw, who had complete control over Esquire, and that Esquire did not maintain any corporate formalities. *Id.* at ¶¶ 37–38, 44. Esquire did not have any business discretion independent of Thaw. *Id.* at ¶ 44. Thaw also misused Esquire's bank account to pay for his car. *Id.* at ¶ 64. Thus, the Court finds sufficient evidence in the record to demonstrate that Thaw dominated both Esquire and Dunhill.

demonstration of undercapitalization, plaintiff has still overwhelmingly shown that defendant abused the corporate form for his own personal benefit throughout Olympia's existence.").

### ii.  Fraud or Wrong

Next, the Court must determine whether Thaw's domination of Esquire and Dunhill "was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury." *JSC Foreign Econ. Ass'n Technostroyexport*, 386 F. Supp. 2d at 464.  Plaintiffs argue that "[t]hrough Thaw's domination, [Dunhill] has committed a wrongful act against the Plan:  it has failed to pay any portion of the withdrawal liability that it owes and has failed to pay any quarterly installment payments, which are due and owing regardless of whether an employer challenges the assessment."  (Pl. Opp'n 32.)  Defendants argue that Plaintiffs cannot establish that Thaw's actions directly harmed Plaintiffs because there is "no causal relationship between Thaw's alleged 'dominance' and the fact that Dunhill's post-2008 income was insufficient to pay the withdrawal liability."  (Def. Reply 24, 27)

Where "the owners, through their domination of the corporation abuse the privilege of doing business in the corporate form to perpetrate a wrong or injustice against a party a court in equity will intervene."  *Fed. Nat'l. Mortg. Ass'n*, 724 F. Supp. 2d at 318 (alterations omitted) (quoting *Morris*, 82 N.Y.2d at 142).  If a corporation is not able to pay its debts to the plaintiff as a result of the owner's domination that is an inequitable consequence sufficient to meet the "fraud or wrong" prong.  *EFCO Corp. v. Nortek, Inc.*, 205 F.3d 1322, at *2 (2d Cir. 2000*); Fed. Nat'l Mortg. Ass'n*, 724 F. Supp. 2d at 320 (finding "fraud or wrong" established where the "defendant raided the assets of the company for his own purposes, indifferent to whether his steady drain of funds from its coffers would impair its ability to meet its substantial contractual obligations to Fannie Mae (and other parties)"); *Capital Distribution Servs., Ltd. v. Ducor*

*Express Airlines, Inc.*, No. 04 Civ. 5303, 2007 WL 1288046, at *3 (E.D.N.Y. May 1, 2007)

("[T]he diversion of funds to make a corporation judgment-proof constitutes a wrong for the

purposes of determining whether the corporate veil should be pierced" (citation omitted));

*Rotella v. Derner*, 723 N.Y.S.2d 801, 802 (App. Div. 2001) ("Where, as here, an

undercapitalized corporation is unable to pay a judgment debt and there has been 'disregard of

corporate formalities and personal use of corporate funds, . . . there is sufficient evidence of

wrongdoing to justify piercing the corporate veil'" (citations and alterations omitted)).

The Plan has been underfunded since 2004. (Mickel Decl. ¶ 4.) On April 7, 2008, Thaw

called the Plan asking about the withdrawal liability. (Mickel Supp. Decl. Ex. A.) By letter

dated April 25, 2008, the Plan informed Dunhill that its estimated withdrawal liability as of

December 31, 2007 was approximately $885,000. (Mickel Supp. Decl. Ex. B.) On December

31, 2008, Dunhill stopped making contributions to the Plan. (Pl. 56.1 ¶ 18; Def. 56.1 ¶ 18.) In

January of 2009, Dunhill auctioned off all of its remaining assets. (Thaw Supp. Decl. ¶ 17.)

Thaw claims that he used the money from selling Dunhill's assets to pay its creditors, but he did

not inform the Plan of Dunhill's withdrawal at the time of its withdrawal. (Thaw Supp. Decl. ¶

17; Pl. 56.1 ¶ 44.) Thaw waited until June or July of 2009 to inform the Plan that Dunhill had

withdrawn. (Mickel Supp. Decl. ¶ 5, Ex. C.) Thaw told the Plan that he hoped the layoff would

be temporary, despite the fact that Dunhill had sold all of its assets six months prior to notifying

the Plan of its withdrawal. (Mickel Supp. Decl. Ex. C.) As a result, the Plan did not issue the

notice of liability until January of 2010. (Pl. 56.1 ¶ 21.) During this time, Thaw continued to

use the corporate assets to pay for his own personal expenses, including trips to Spain, Los

Angeles, Michigan and Detroit. *Id.* at ¶ 55. Thaw had the sole decision making power for

Dunhill, and, thus, he made the decision not to inform the Plan of Dunhill's withdrawal for over six months and not to make any payments to the Plan on the withdrawal liability. *Id.* at ¶ 44.

The undisputed facts demonstrate that Thaw's domination of Dunhill and Esquire, including his personal use of Dunhill's funds and misrepresentations to the Plan concerning Dunhill's withdrawal, resulted in the failure to make any payments to the Plan for the assessed withdrawal liability. *See Bogosian*, 2011 WL 4460362, at *9–10 (granting summary judgment in favor of plaintiff and finding that the veil should be pierced because the shareholder dominated the corporation and then diverted its funds, in part to pay for his own travel and lodging expenses, rendering the corporation judgment proof); *Fed. Nat'l Mortg. Ass'n*, 724 F. Supp. 2d at 319–21 (granting the plaintiff's motion for summary judgment to pierce the corporate veil where the defendant had routinely used corporate funds for personal use "indifferent" to whether his use of the funds would prevent the corporation from meetings is contractual obligations). The Court finds that Thaw dominated Esquire and Dunhill and that as a result of that domination, Dunhill did not pay any portion of its withdrawal liability to the Plan. Plaintiffs' motion for summary judgment against Thaw is granted.

## III.    Damages

"In any action to collect withdrawal liability 'in which a judgment in favor of the plan is awarded, the court shall award the plan,' in addition to the unpaid withdrawal liability, reasonable attorneys' fees and costs, interest, and liquidated damages." *UNITE Nat'l Ret. Fund*, 2009 WL 2025163, at *4 (quoting 29 U.S.C. § 1132(g)(2)); *Nat'l Pension Plan of the UNITE HERE Workers Pension Fund*, 2006 WL 1292780, at *4. These remedies are mandatory. *See Transportacion Maritima Mexicana*, 901 F.2d at 265; *UNITE Nat'l Ret. Fund*, 2009 WL 2025163, at *4. Accordingly, the Court finds that Dunhill, Esquire and Thaw are jointly and

severally liable in the amount of $621,512.75, plus reasonable attorney's fees and costs, interest and liquidated damages.

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion for partial summary judgment is granted in part and denied in part, and Plaintiffs' motion for summary judgment is granted in part and denied in part. The Court finds Dunhill, Esquire and Thaw, jointly and severally, liable for the withdrawal liability, plus reasonable attorney's fees and costs, interest and liquidated damages. The Court dismisses the Amended Complaint as to Sanford and Custom Stainless. Defendants' motion for protective relief is denied as moot. Plaintiffs are directed to submit a proposed judgment to the Court within 14 days of this Order.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: April 3, 2013
       Brooklyn, New York